# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | 8:08CR183 |
| | ) | |
| RONALD PROKUPEK and | ) | REPORT AND |
| CHRISTINE McGLOTHLEN, | ) | RECOMMENDATION |
| | ) | |
| Defendants. | ) | |

This matter is before the court on the defendants' motions to suppress evidence (Doc. 49* & Doc. 52).  An evidentiary hearing was held on February 11 (Doc. 63), March 24 (Doc. 71), and May 13, 2009 (Doc. 76).  The motions were deemed submitted upon the filing of the final volume of the hearing transcript on June 2, 2009.

On the night of February 29, 2008, the defendants' vehicle was stopped by a Nebraska state trooper for a traffic violation at a ruse checkpoint on Interstate 80.  Both defendants were interviewed and a police service dog indicated to the odor of an illegal substance coming from the vehicle.  The state troopers searched the vehicle and found drug paraphernalia and a quantity of crystal methamphetamine.

The driver, Ronald Prokupek, contends that his Fourth Amendment rights were violated, and all physical evidence and statements should be suppressed, because the officer did not have probable cause to believe Prokupek committed a traffic offense; the officer did not have reasonable suspicion to believe that either of the defendants were engaged in

---

*This opinion contains hyperlinks to other documents or Web sites.  The U.S. District Court for the District of Nebraska does not endorse, recommend, approve, or guarantee any third parties or the services or products they provide on their Web sites.  Likewise, the court has no agreements with any of these third parties or their Web sites.  The court accepts no responsibility for the availability or functionality of any hyperlink.  Thus, the fact that a hyperlink ceases to work or directs the user to some other site does not affect the opinion of the court.

criminal activity; the traffic stop was unlawfully expanded into a drug interdiction investigation; and the vehicle was searched without a warrant and without probable cause or the consent of either party.

The passenger, Christine McGlothlen, concurs in these arguments. She also alleges that the state trooper detained her "in a manner both unreasonably and unnecessarily intrusive, in violation of her rights under the Fourth and Fourteenth Amendments of the United States Constitution."

Both defendants challenge the training, certification, and reliability of the police service dog, Rocky.

## I. FACTUAL BACKGROUND

State Patrol Trooper James Estwick and State Patrol Sergeant Lonnie L. Connelly testified on behalf of the United States. An expert witness, Steven D. Nicely, testified for the defense. State Patrol Sergeant Andrew John Duis was called as a rebuttal witness. Their testimony is summarized below.

### A. Trooper James Estwick

Nebraska State Patrol Trooper James Estwick testified that he has been with the State Patrol for 10 years and is assigned to Traffic Services, enforcing the Nebraska rules of the road and conducting criminal interdiction investigations. He was trained at the Nebraska State Patrol academy.

On February 29, 2008, Estwick was working on a "HIDA grant" project located at the Utica exit (mile marker 366) on Interstate 80 in Seward County. The State Patrol had set up a ruse checkpoint at that location because there was nothing in that area for miles north or south. The officers were strategically positioned throughout the interchange. Estwick was in uniform in a marked patrol vehicle parked in the northwest quadrant of the interchange.

-2-

Trooper Estwick testified that a red Pontiac exited at the 366 interchange and failed to signal its northbound turn onto the highway from the exit ramp. Estwick followed the Pontiac and initiated a traffic stop some time between 9:30 and 10:00 PM. Estwick approached the driver, defendant Prokupek, and asked for his driver's license, registration and insurance. Prokupek appeared "kind of fidgety, a little agitated, gritting teeth" and said he did not have a driver's license. At Estwick's request, Prokupek exited the Pontiac.

Although Estwick's patrol vehicle was equipped with a camera, the camera was facing backwards, towards the cage, because Estwick had just returned to the checkpoint from making another arrest. Estwick testifies that when he takes someone to the jail, he turns the camera backwards so he can film what is going on in the cage; he failed to turn it back forward when he left the jail. Nor was the microphone working.

Trooper Estwick testified that he told Prokupek he was going to place him in handcuffs until backup arrived because they were "out in the middle of nowhere," and it was dark. Prokupek was also exhibiting behaviors Estwick had observed in individuals who were under the influence of narcotics, i.e., gritting teeth, inability to sit still, and nervousness. Estwick placed Prokupek in the back seat of the patrol vehicle and asked if he had any identification. Prokupek said he had a license; he just didn't have it on his person.

Estwick then returned to the Pontiac to contact the passenger, defendant McGlothlen, to find out if she had identification and to see if he could get the vehicle's registration. McGlothlen provided a Nebraska license and a Michigan license, and registration papers showing that the vehicle was registered in Michigan. Estwick asked where they were coming from and where they were going. McGlothlen told him they were coming from Scheels in Lincoln and were going to Shelby. She was agitated by the stop and the tone of her voice was angry. Estwick explained why the vehicle was stopped. He also asked if they were transporting anything that they shouldn't have been transporting, and she said no.

-3-

Because it was McGlothlen's vehicle, Estwick asked her if he could look inside, and she said, "absolutely not, I know my rights."  (#63, 13:22-24).

Trooper Grove and Sergeant Connelly had arrived as backup a couple minutes into the stop.  Grove was parked directly behind Estwick, and Connelly was parked behind Grove.  Trooper Grove had McGlothlen exit the vehicle and come back to his vehicle with him.

Estwick testified that he returned to his own patrol car, took Prokupek out of the cage, removed the handcuffs and put him in the front seat.  Estwick filled out the citation form and obtained biographical information from Prokupek, who had no identification on his person.  Approximately 10 minutes into the stop, Estwick gave the State Patrol dispatcher the information he had obtained from both McGlothlen and Prokupek. (Doc. 63, 32:1-7, 16:9-10).  Meanwhile, Estwick observed that Prokupek could not keep his hands or feet still and was gritting his teeth.  Estwick described Prokupek's pupils as "kind of weird acting and real glossy."  (Doc. 63, 17:1-3).  According to Estwick, Prokupek exhibited the telltale signs of someone who has been using drugs.

While waiting for information from the State Patrol dispatcher, Estwick asked Prokupek where they were traveling.  Prokupek said they were coming from Lincoln and were looking at buying a four-wheeler from a friend.  Prokupek said the Pontiac did not belong to him; he may have had a blanket in there, but that was all.

The dispatcher reported that Prokupek had a valid license.  Estwick then issued him a citation for failing to signal[1] and a violation card for not having his operator's license on

---

[1]The court took judicial notice (Doc. 63, 71:18) of Neb. Rev. Stat. § 60-6,161, which provides:

**Turning or moving right or left upon a roadway; required signals; signals prohibited**.

(1) No person shall turn a vehicle or move right or left upon a roadway unless and until such movement can be made with reasonable safety nor without giving an appropriate signal in the manner provided in sections 60-6,162 and 60- 6,163.

(2) A signal of intention to turn or move right or left when required shall be given continuously

-4-

his person.  Estwick also asked Prokupek if he had been doing any drugs, and he said no. Estwick then said, "You're not lying to me, are you? ...  [H]ave you been doing any drugs? You don't need to lie to me."  Prokupek responded that he had not done drugs since his DWI.  (Doc. 63, 18:21-25).

Estwick then had Prokupek get out of the patrol car. Estwick also exited the patrol car, told Prokupek he was going back to the Pontiac, and told Prokupek to have a seat in the back of the patrol car.

Estwick then went to the back of the Pontiac and spoke with Sergeant Connelly, explaining about the traffic stop and that the driver appeared to be under the influence of something.  Sergeant Connelly told Estwick to finish with the traffic stop, and he would walk his dog around the car.  Sergeant Connelly then prepared to deploy his dog.

After deploying the dog, Sergeant Connelly advised that the dog indicated to the presence of illegal drugs on the open window and instructed Estwick and Grove to search the Pontiac.  Trooper Grove found a black scale on the passenger side floor.  Estwick opened the armrest console on the driver's side and found a plastic baggie with what appeared to be crystal methamphetamine. They also found a glass methamphetamine pipe.

Trooper Estwick returned to his car and placed Prokupek under arrest.  Trooper Grove placed McGlothlen under arrest.  The two defendants were taken to the Seward County Jail.

---

during not less than the last one hundred feet traveled by the vehicle before turning.

(3) No person shall stop or suddenly decrease the speed of a vehicle without first giving an appropriate signal in the manner provided in such sections to the driver of any vehicle immediately to the rear when there is opportunity to give such signal.

(4) The brake and turnsignal lights required on vehicles by section 60-6,226 shall not be flashed on one side only on a disabled vehicle, flashed as a courtesy or do pass signal to operators of other vehicles approaching from the rear, or flashed on one side only of a parked vehicle except as may be necessary for compliance with this section.

### B.  Sergeant Lonnie L. Connelly

Lonnie L. Connelly testified that he has been employed by the Nebraska State Patrol for 18½ years.  Upon graduating from the Academy, Connelly as assigned to the traffic services division in Ainsworth for four years.  He has been a police service dog handler since September of 1994.  He remained in Ainsworth for about three years and then worked as a police service dog handler in Columbus. Connelly was promoted in 2003 and relocated to Lincoln.  He is now a sergeant, and supervises the eastern half of the Police Service Dog Division.

To obtain training for the Police Service Dog Division, the applicant is interviewed and must meet physical fitness requirements.  After the selection process, the officer is paired with an animal, a dog.  Connelly testified that his initial training, consisting of 11 weeks of basic training, took place in Lincoln at the training academy.  He subsequently participated in approximately 400 hours of training.  After the completing the 11 week basic training, the handler and the dog are tested.  They are "certified" if they pass the tests.

Connelly was certified in 1994 by Sergeant Mike Kerby.  He was continually certified as a dog handler from 1994 up through October 2008, working with three different dogs.  He began working with his current dog, a Belgian shepherd named Rocky, in 1999.  Rocky is a dual-purpose dog, that is, he does both detector work and patrol work.  For patrol work, Rocky is trained in handler protection, tracking, building searches, area searches, and evidence recovery. Rocky is also used with the SWAT team to do target disruptions, perimeter control, drag lines, and the like.

For purposes of detector work, Rocky has been trained as a "passive indicator," i.e., to alert and then sit and stare at the source of an odor.  An "alert" is a change in the dog's body posture that is noticeable to the handler.  Sergeant Connelly testified in detail regarding the process of training Rocky to detect the odors of marijuana, heroin, cocaine, and methamphetamine.  (Doc. 63, 108:18-116:18).

-6-

The Nebraska State Patrol trains and certifies its dogs internally, although it sometimes uses judges who are from other states. (Doc. 63, 136:25; 137:7). On October 9, 2007, Sergeant Connelly and PSD Rocky were certified by the Nebraska State Patrol as a Narcotics Detector Dog Team (PSP-2). The certificate (Ex. 3) was signed by Andrew Duis, Judge and Captain Mike Kerby, Director of Training.

According to Sgt. Connelly, to obtain NSP certification, the handlers and their dogs come to Grand Island and go through a certification process involving approximately 10 exercises over a three- to four-day period. The applicants are judged by Sergeant Duis, who completes a grade sheet, assigning grades for each search/sniff. The dogs are assigned grades for searching and for indication, for each sniff. The average of the grades determines whether the dog and handler are suitable for service or not.

The Nebraska State Patrol uses the training the manual created by Wendell Nope, of Utah. Wendell Nope is the head trainer for the Utah State Police. (Doc. 71, 283:16-17). Mr. Nope is the lead representative of the International Congress of Police Service Dogs in the United States. (Doc. 63, 142:19-143:14).

Exhibits 4 and 103[2] contain Rocky's certification grade sheet from October 9, 2007. The possible grades range from 1.0 (Superior) to 6.0 (Unsatisfactory). A grade of 3.0, "Typical," is meant to reflect that the dog did what a typical police dog is expected to do as to the particular task. In summary, Rocky was graded on his performance in searching for and appropriately alerting and indicating to the odors of marijuana, heroin, cocaine and methamphetamine under various circumstances. Rocky received an average score of 3.42 on indicating, an average score of 2.4 for searching, and a score of 3 overall. (Doc. 63, 95:25-96:2). In two instances, Rocky's performance was described as "fringed," meaning that he did not go to the strongest source of the odor and only hit the fringe of the odor.

---

[2]Connelly's corresponding performance documentation records are also included in Exhibit 103.

(Doc. 63, 19:23-94:2).  His performance was described as "slow" on two occasions, and on one occasion Rocky alerted to an odor but left without indicating.  (Doc. 63, 91:23-92:18).

Connelly testified that he continued his training with Rocky after the October 9, 2007 recertification.  He supervises five dog teams and works with his own dog. Typically, they try to make the training scenarios as realistic as possible with the goals of maintaining the dogs' skills, reenforcing what the dogs have already been taught, and bringing up new scenarios throughout the service dog's life to keep the dogs proficient.  (Doc. 63, 96:23-97:9).  The dogs' training sessions, as well as actual deployments, are documented on a "Police Service Dog Performance Documentation" form.  *See, e.g.,* Exhibit 6.

A "Police Service Dog Report," also known as a "use form" or "deployment form" or "field report" is completed each time the dog is deployed.  Sergeant Connelly stated that his practice is to complete these forms immediately after he deploys his dog.  (Doc. 63, 105:7-106:3).  Exhibit 5 contains all of Connelly's deployment field reports from March 2007 through March 2008.

Sergeant Connelly testified that he was an active participant in the ruse checkpoint on the night of February 29, 2008.  He was in uniform in a marked cruiser equipped with audio and video equipment.[3]  Between 9:20 and 9:30 p.m., Connelly received a call for backup.  He was approximately 1 mile away.  When he arrived at the scene, he approached the suspect vehicle and saw Trooper Estwick having a conversation with the female passenger, who was still sitting in the vehicle.  Connelly also saw a subject sitting in the front seat of Trooper Estwick's vehicle.  Estwick had handcuffed the driver.  Things seemed to be under control, so Connelly made his way back to his own patrol vehicle and served as backup.  He did not have any direct contact with McGlothlen or Prokupek at that time.

―――――――――――――――――

[3]Exhibit 2 is the tape captured from Sergeant Connelly's video camera.  The exhibit was received as to information depicted from the beginning of the tape through the time of the officers' location of contraband in the defendants' vehicle.  (Doc. 63, 167:11-12).

According to Sergeant Connelly, Estwick finished speaking with McGlothlen and returned to his cruiser to talk to Prokupek. Estwick returned and spoke with Connelly at the back side of the defendants' Pontiac. Estwick told Connelly he suspected criminal activity based on the actions of the driver. Connelly recalled that he told Trooper Estwick to carry on with the stop and see what would happen. He went back to the front of his own vehicle and stayed there. During this time, he made a phone call to Trooper Ron Kosiba in Columbus to see if Kosiba recognized the name Ronald Prokupek. Kosiba said he did not.

At some point, defendant Prokupek's handcuffs were removed and Prokupek was removed from the cage of Estwick's car, patted down, and placed in the front seat of Estwick's car. Estwick had another conversation with Prokupek and completed his investigation and paperwork. Estwick then exited his patrol car, told Sergeant Connelly that defendant McGlothlen had denied consent to search the vehicle, and asked Connelly to run his dog on an exterior sniff of that vehicle. Connelly walked around the defendants' vehicle to look for hazards, returned to his patrol car, retrieved police service dog Rocky, and commanded Rocky to search for drugs around the defendants' vehicle.

According to Sergeant Connelly, Rocky did not alert during the first rotation around the vehicle; however, as they began a second rotation, Rocky alerted to the passenger door seam. Rocky turned perpendicular to the door seam and was intently sniffing that door seam. Connelly continued to move on, and the dog moved on with Connelly. Rocky then alerted to the driver's side window, which was down, and indicated by sitting on the driver's door seam. This deployment took approximately one minute. Estwick removed Rocky from the scene and advised Trooper Estwick that the dog had alerted.

Sergeant Connelly observed from the ditch as Troopers Estwick and Grove searched the defendants' vehicle.

### C.  Steven Douglas Nicely

Steven Douglas Nicely testified that he is a dog trainer and a police dog consultant. He served as a military policeman in the Marines beginning in 1972 and went into civilian law enforcement in 1979.  He has served as a deputy sheriff and as a police officer in Bexar County, Texas.  Nicely worked with drug dogs and patrol dogs in these jobs.  (Doc. 71, 206:17-207:3).  The three police departments he worked for each had about 20 officers and one to three patrol dogs.  (Doc. 71, 300:1-19).  He also served as a consultant and trainer for the narcotics detector dog division for the Constables Office in Bexar County.  Exhibit 101 at p. 2.

In 1989, Nicely began professional training dogs for Global Training Academy ("Global").  He trained approximately 750 dogs for Global between 1989 and June 2006. Approximately 500 of the 750 dogs were trained for narcotics detection.  Other dogs were trained for use in private industry and for land mine clearance in foreign countries.

In June 2006, Nicely took a job as a police officer for the city of New Braunfels, Texas.  He later resumed his employment with Global.  Nicely described Global as a large private police dog training company.  Nicely testified that he was the senior trainer for almost the entire time he was there.  He trained handlers, instructors and trainers.  He wrote lesson plans and procedures, taught, and participated in the selection of dogs in the United States and in Europe from 1996 to 2005.  Nicely has provided instruction to law enforcement regarding training and use of police service dogs and has written and published manuals and articles on the subject of police service dog training.

Nicely testified that he reviewed Rocky's certification process, records that reflect his field performance and training, videos of the dog from this case and in a couple of other cases, the manual for the Nebraska State Patrol; the Narcotics Detector Dog Grade Sheet signed by Sergeant Duis on October 9, 2007.  He stated that he has reviewed six or seven

of the Nebraska State Patrol's dogs over the last year or two but could not remember the specific cases, dogs or handlers.

Mr. Nicely opined that the Nebraska State Patrol's manual was not sufficient to enable a handler to properly train and deploy a reliable police service dog because "They don't provide the handler the information that he really needs to know." (Doc. 71, 218:12-19). Nebraska uses the manual of the International Congress of Police Service Dogs (ICPSD). Nicely stated he has been unable to locate any information about the rules and standards of the ICPSD, aside from the information published by Wendell Nope. He was aware of a number of states or districts that use the ICPSD standard, but its use was "not that common" and it was not mentioned by the trainers he encountered in his trips to Europe. (Doc. 71, 219:19-25; 220:22-221:13). According to Nicely, the United States Police Canine Association, the National Association of Police Work Dogs, and the National Narcotic Detector Dog Association have published standards that are most commonly relied upon in the United States.

Exhibit 106 is Section 5.01 of the Nebraska State Patrol's training manual. Based on his review of the Nebraska State Patrol certification standards, Nicely opined that these standards "could" reflect a valid certification process "if they included a couple of things and if they followed the written standards." (Doc. 71, 222:14-17) Mr. Nicely was critical of the State Patrol's training and certifying their dogs internally, because other agencies and organizations preferred to send their dogs "somewhere else just to have an external influence." (Doc. 71, 223:13-20). He stated that the United States Police Canine Association, the National Association of Police Work Dogs, and the National Narcotic Detector Dog Association would not recognize the type of internal certification that is practiced by the Nebraska State Patrol as a valid certification.

Mr. Nicely also took issue with the method of grading or scoring utilized in the State Patrol's certification process:

> They go through a one through six scoring system. Two, three, four, five and six means that something is missing. And since they don't label everything, it's – it would be reasonable to say that they equate each one of equal value.
>
> Very simple. Five – five times twenty is a hundred. They allow four, which is three full elements, to be missing. Three out of five is 50 percent missing or 40 percent efficient... When you ... measure behavior, you measure it by ... percentages, not ... by grades[.]

(Doc. 71, 225:13-23).  For example, as to "indication," a dog could receive a passing grade of four without exhibiting the defined final response for indication.  On cross-examination, he opined that a dog should be required to receive scores of one at least 90 percent of the time, "or I wouldn't be putting this dog out."  (Doc. 71, 331:1-11).

Nicely personally would not entertain any subjective considerations in evaluating a dog and would not give the dog any credit for detecting an odor if the dog did not exhibit the final response of indicating.  Using Nicely's preferred methodology, the only considerations are whether the dog exhibits the final defined response (as provided by the handler) and whether the dog exhibits the response at the source of the drug odor or where the drug odor would be expected to be exiting.  (Doc. 71, 228:20-24).  According to Nicely, this is the "black and white" methodology used at Global.

Nicely also testified that the Nebraska State Patrol's manual failed to address the issue of false responses and did not explain how to test the dog's ability to locate residue or unmeasurable amounts of the targeted substances.  He was critical of a lack of information on the grade sheets as to how the exercises were set up; for example, he could not tell from the sheet how the controlled substances were prepared and placed in the various locations.

Exhibit 102 is a table prepared by Mr. Nicely and captioned "Repetitive Testing Table," together with grade sheets for Nebraska State Patrol service dogs Keya and Vader, one of which was tested in October 2007 during the same session as Rocky.[4]  Based on the

---

[4]The document makes no mention of Rocky, the dog deployed in this case.

-12-

information he included in the table, Nicely agreed with defense counsel that the Nebraska State Patrol's testing was repetitive and the State Patrol was generally running the same certification test over and over, which other organizations do not do.  (Doc. 71, 237:13-21).

Nicely appeared to question the utility of testing a dog's ability with respect to automobile interiors because, "as an officer out on the street, you don't get to go into ... someone's vehicle unless you have probable cause ... or consent.  We use the dog to detect ... something concealed within the vehicle first."  (Doc. 71, 235:10-14).  Nicely stated he could not determine from the State Patrol's documentation whether the dog was capable of detecting four grams of cocaine placed inside of a vehicle from the exterior of the vehicle. (Doc. 71, 236:15-18).

Nicely also testified that the Nebraska State Patrol's certification methods did not properly addressed controlled negative testing because:

> [A] blank room or a blank vehicle in conjunction with a dog going over and making a find is not a controlled negative test.  We want to know –  Say, for example, there's been – based upon information I've got, they use five vehicles in their certification.  I want to know can that dog search all five vehicles without responding.

(Doc. 71, 237:22-238:2).  He had reviewed deposition testimony of Sergeant Duis to the effect that the State Patrol used five cars, two with aids and the rest blank, pursuant to its manual.  The officer/handler was thus aware that two of the cars would always have a targeted aid.  In a true controlled negative test, the handler would not know whether a targeted aid would be present in any of the cars.  According to Nicely, however, no certifying organizations perform true controlled negative testing, other than the DOD, Chatham County (Georgia), and Global.

Exhibit 103 indicates that Rocky was given a two-minute training session on October 9, 2007 two minutes after an exam and 33 minutes prior to the next exam.  Sergeant Connelly had testified (Doc. 63, 187:21-189:10) that this was done in order to reward the

-13-

dog, because the dogs could not be rewarded during the testing exercises. Nicely was critical of the practice because the State Patrol should have included a schedule of reinforcement so that the handlers could conduct the tests without having to go out and do training so that they could reinforce the dog. (Doc. 71, 273:7-16). He opined that "The worst thing you can even do is have your dog on a continuous schedule of reinforcement," because it reduces the dog's reliability; the dogs are more reliable when they are awarded randomly. (Doc. 71, 273:23-274:12).

Nicely testified that he had reviewed two videotapes of Rocky which were taken in other cases. He criticized the performance of the dog and the handler, generally opining that the dog should have taken the lead when the dog detected an odor, the dog should have reacted differently to odors, and the dog's performance was adversely affected by subconscious cuing from the handler (Doc. 71, 276:21-279:17).

On cross-examination, Mr. Nicely acknowledged that he did not have a college degree and has never been certified as a dog trainer. The last time he actually worked as a dog handler in the field "to some degree" was in the mid-1990s. (Doc. 71, 281:1-11). Since 1989, he has not trained police service dogs outside of Global. (Doc. 71, 283:7-12). He does not endorse any organization's standards except those of Global, the DOD, and Chatham County. The only standards he does endorse are those posted on Global's web site. He would use the standards of the organizations which he does not endorse in order to evaluate the standards of the International Congress of Police Service Dogs, but stated he was unable to find any standards published by the ICPSD. Apparently, for purposes of reviewing and comparing the standards set by the various organizations, Nicely relies heavily on information that is published on the internet. (Doc. 71, 283:16-284:17). He has not ever trained with other instructors who are from the ICPSD, (Doc. 71, 316:18-24), and has received no training in completing or interpreting the grade sheets used by the ICPSD (Doc. 71, 318:11-14). He did receive training "in the aspect of analyzing behavioral recorded

-14-

documents" by taking courses in behavioral modification and applied psychology at San Antonio Community College and is currently studying psychological research at the college level. (Doc. 71, 317:21-25). He has never graded a dog using the ICPSD system and stated that he did not believe in the ICPSD grading system because it was too subjective. (Doc. 71, 319:24-320:1).

In 2006, Nicely started a business called K9 Consultants of America in which he performs consulting services for criminal defendants regarding drug detection dogs. He also did this type of consulting from 1993 through 1998. Nicely estimated that he was paid "a couple of thousand" for his work in this case. (Doc. 71, 284:22-286:16). He maintains a web site for his business, and admitted that he had utilized the information posted on the Chatham County (Georgia) web site, without requesting permission to do so, by linking it to an image. He began working with drug detection dogs in about 1987, shortly before he left employment with the Terrell Hills, Texas police department after "a mishap, tragic event that occurred that has subsequently been expunged from public record." (Doc. 71, 296:20-297:5). He was unemployed from September 1986 until August 1989, when he started as a trainer for Global. He was deployed to Iraq in 2005, *see* Exhibit 101 at p. 1, but did not complete that contract.

On cross-examination (Doc. 71: 301:1-304:7), Mr. Nicely testified that Global had separate processes for initial certification and recertification, as posted on its web site. The initial certification process required a minimum of 20 aids. The team must find 85% of all of the aids, and the dog must exhibit the final response at the location of the substance. If a dog responds incorrectly more than 10% of the time, it fails. Global's tests are generally conducted "within two primary areas," i.e., vehicles or buildings, and an optional third area or luggage. A certain percentage of the aids, perhaps 40%, must contain a minimum amount. There was also a midrange, and the instructors were given the discretion to adjust about 20% of the aids to "incorporate realistic type situations as much as possible. There

was a minimum of at least one 20-minute search where no aid is placed.  This the process that Nicely used in initially certifying dogs at Global, and he certified approximately 450 to 500 dogs in this manner.  (Doc. 71, 305:17-306:3).

Nicely was also involved in Global's recertification program.  The recertification program incorporated the use of distracting odors or other things such as food, urine, or packaging that could cause the dog to respond incorrectly.  Nicely testified that he recertified approximately 400 dogs.

Nicely admitted that he had conducted internal certifications at Global, as the company required him to certify and/or recertify the dogs he had trained himself.  Global's practice of internally certifying its own dogs was acceptable to Nicely, however, because he approved of their documentation and records.

Global's certification process differs from that of the Nebraska State Patrol in that it has six more aids and a controlled negative test.  Nicely surmised that, due to repetitive testing, the Nebraska handlers must know whether a particular test would be including a controlled substance odor.  Also, Nicely could find no indication in the State Patrol's documentation that the examiner would put anything inside a vehicle and determine whether the dog could detect the odor from outside the vehicle with the windows closed.   In his opinion, the Nebraska State Patrol's test "doesn't verify anything, and as a result of it, without this validity you can't support the other aspects. So it's an invalid ... test because the handlers know what the ... questions are, so they know what the answers are, and it's just like cheating[.]"  (Doc. 71, 271:3-8).

Mr. Nicely has never attended a Nebraska State Patrol's certification session, has never seen the State Patrol certify dogs, has never seen the dog Rocky in person, and has never personally observed dogs being trained by the Nebraska State Patrol.  He has, however, reviewed the videotapes of Rocky supplied to him for consulting purposes.

-16-

### D.  State Patrol Sergeant Duis

Andrew John Duis testified on rebuttal that he is currently assigned as a sergeant within the Nebraska State Patrol's police service dog division and is the head trainer for that division.  He was first employed by the Nebraska State Patrol in 1988 and served as a trooper assigned to the traffic division until 1990, at which time he entered the investigative services division.  In 1997, Duis was selected as a police service dog handler.  In 2001, he was certified as an instructor within the police.

In 2005, Duis was certified as a judge for the International Congress of Police Service Dogs.   To obtain certification as a judge, Duis was mentored by a teaching judge for two to three years.  There are four international teaching judges in the United States, one of whom is Captain Mike Kirby of the Nebraska State Patrol.  Duis testified that he worked closely with Kirby concerning the grading and learning the process in which a dog is certified. Duis had to write a term paper and had to grade with Kirby 50 police service dog teams to show that he was proficient in using the grading system and recognizing a suitable dog.

Duis explained that this process was originally the West German police method of training and was adopted by the International Congress.  The head of the International Congress in the United States is Wendell Nope, who is also the original teaching judge in the United States.  A teaching judge is able to certify judges.  The other three teaching judges in the United States are Mike Kirby of the Nebraska State Patrol, Jeff Lentz of Jacksonville, Florida, and Phil Yarnell of the Springfield, Missouri, Police Department.

The rationale behind the certification process is to determine whether the police service dog team is suitable for service on the street.  The testing scenarios are meant to be street realistic and challenging so that the team's proficiency can be determined.  Different environments are used to determine how the dog will react in a variety of environments in which the team may be asked to work.  During the testing process, the finds are all unknown

to the handlers when they enter the exercise, and the finds remain unknown even after the handlers leave the exercise.

The teams from outside agencies return to their agencies or areas. The teams assigned to the Nebraska State Patrol do maintenance training one day per work week, and teams from the outside agencies are free to attend the State Patrol's weekly training sessions if they choose to do so. Sergeant Lonnie Connelly, Lieutenant Mark Stokey and Trooper Ron Kosiba are maintenance training instructors. During the weekly maintenance training, the handlers cover all the aspects that for which their dogs would be deployed.

Duis testified that his initial training to become a dog handler was an eight- to 10-week program covering all aspects of being a dual-purpose police service dog handler. The course involved classroom time as well as practical applications of being a police service dog handler. At the conclusion of that training, Duis went through a certification course, took a written test and was initially certified as a police service dog handler.

In 2000, Duis began the process to become an instructor. At that time, the process required Duis to attend another camp and watch the instruction under the guidance of Lieutenant Kirby of the Nebraska State Patrol. Duis then attended another camp and participated in the instruction of that camp under the guidance of then Lieutenant Kirby. Duis was then certified as an instructor and began running camps on his own. The entire process took between 12 and 18 months. Since that time, Duis has been running camps for the Nebraska State Patrol and other agencies. He provides training and certification for approximately 150 dog teams in four states.

Typically, each camp is attended by or handlers from several different agencies, depending on whoever has requested training. Sometimes there are no representatives from Nebraska State Patrol in a particular camp. Duis participates in all the certifications issued from his camps.

-18-

A camp for dual purpose dogs lasts about 13 weeks.  At this time, a camp for training narcotic detector dogs takes approximately six weeks.  The teams requesting dual purpose training then return for a second six- to seven-week session covering the patrol aspect.

Certification evaluations are scheduled at the end of the initial six week session for the narcotic detector dogs. The team will be certified if the handler and dog pass the practical portion of the examination and the handler passes a written examination.

The Nebraska State Patrol typically runs two or three training camps per year and 15 to 20 recertification sessions.  Sergeant Duis testified that the certification process consists of 11 searches with a total of 14 finds. It is a scenario-based certification and it is done on a grading system. The handler's skill is graded, the police service dog's searching skill is graded, and the dog's indication behavior is graded for each of the 14 finds.  A variety of search areas are used:  vehicles, a residence (including the bathroom, kitchen and a bedroom), a locker room,  a dark room search, a storage stockroom, and a barn stall. At the conclusion of the certification process, all of the dog's grades for its indication behavior are averaged.  The dog must achieve a 4.0 or lower in order to become certified.  The annual recertification process for narcotic detector dog is exactly the same as that for original certification.

Paragraph 5.01 of the State Patrol's manual provides, "The quantities of the substances in the competency evaluation shall be limited to 5 grams."  (Exhibit 106). Sergeant Duis acknowledged that he had used quantities in excess of 5 grams during his certification sessions and testified that he had the discretion, as a judge of the International Congress, to do so.  When Duis certifies a dog, he issues two pieces of paper: (1) the state certification and (2) the international title which Duis can give as a judge.  According to Duis, there are a few state evaluators in Nebraska who can administer the state certification; however, those evaluators are not judges. The original five gram amount was established because many evaluators were evaluating their own agency's dogs, and many of the smaller

agencies did not have access to large quantities of drugs for training.  The five gram amount was intended to avoid sensory threshold issues which would occur if the dogs were exposed to an unfamiliar amount of drugs.  As the program has expanded with more outside agencies participating, larger quantities of drugs have become available for training "and, frankly, five grams is – is sort of rapidly become outdated." (Doc. 71, 366:7-369:25).  Duis admitted that he very often exceeded the five gram limit and tried to expose the dogs to a larger amount, which would be more street realistic for the State Patrol, Douglas County, and those who work the interstate system in Nebraska.  (Doc. 71, 370:4-8).  Duis testified on cross-examination that the head of training for the Nebraska State Patrol, Captain Mike Kirby, had also authorized him to exceed the five-gram limit. (Doc. 71, 382:18-21).

Sergeant Duis testified as to the content and meaning of the information recorded on Exhibit 103, the certification grade sheet he prepared for Rocky in October 2007.  Duis noted that he had completed several years of training in order to grade police service dogs in this manner and did not believe a person who had not been trained could grade a dog using that system.  Duis testified that the grading system works, as follows:

> A typical police dog is a typical police dog that's working the streets of the United States right now. One of the reasons it takes as long as it does to become a judge is you have to expose yourself to a number of different dogs from a number of different areas, and you have to come to a conclusion and come to a realization and ... a true understanding what the typical police dog in the United States does and looks like.
>
> That is a three. That is typical[.]  Each dog is evaluated from that point[.] If ... a dog is typical, it's a three.  If it's better than average – if it performs slightly better than the average police dog, it's probably a two, and if it is absolutely perfect in everything that it's done whether it's the indication behavior or the searching, then it could be a one.
>
> Or going the other way, if a dog would need improvement but is still worthy of working the street, it could be evaluated as a four which means it needs improvement, but it's still worthy of working in the street.
>
> And then a five is a failure as well as a six. A five is a failure. A six basically showed no training behavior whatsoever.

-20-

(Doc. 271, 349:21-350:17).

As to the first exercise ("Piles of Human Clothing"[5]) recorded on Exhibit 103 (at pp. 1 & 5), Rocky received a score of 5 for indication and Duis made the notation, "left odor." Sergeant Duis explained that particular find is for marijuana. The dog located the odor in one of the pieces of luggage, but did not come to an indication behavior and left the odor prior to going into an indication behavior.  Using the State Patrol's grading system, if the dog came back and went into an indication behavior, the dog would still have received a grade of five.  "The dog should not have left that odor. There's a number of reasons why that could happen, but the point is once the dog has left the odor, it's associated itself with it once, it is a five, a failure."  (Doc. 71, 351:1-7).  The performance did not merit a grade of six because the dog did exhibit a trained behavior.  The first exercise also includes a search for 15 grams of cocaine, for which Rocky received an indication grade of three.  The grade of three means that Rocky's indication behavior was typical for a police service dog.  A PVC pipe was put in another piece of luggage to make sure that the dog was not indicating to any other enticing or tempting odors with which the dog was familiar, and that the dog was only indicating to the odor of a controlled substance.  Rocky displayed a typical searching behavior in the first exercise and received a score of three.

Sergeant Duis was asked to comment on Mr. Nicely's testimony that 90 percent of a dog's grades should be ones in order to pass.  He testified that it was possible for a dog to perform an absolutely perfect indication behavior 90 percent of the time under the ICPSD system, but such an expectation was not realistic.  Under the ICPSD system, instances of perfect indication behavior are few and far between, although the dogs may exhibit suitable, recognizable and prescribed behavior during testing.

---

[5]On cross-examination, Duis stated that he substituted items of luggage for "piles of human clothes," an option  he is given as a judge of the International Congress.  (Doc. 71, 403:16-19).

Turning to the issue of training during the recertification examination, Duis explained that it was not organized training:

> when I begin the certification process, when I function as a judge, I am no longer an instructor or a trainer or a fellow handler.... I have one purpose and one purpose only and that is to perform a certification process. So I can't answer questions, I can't assist, I can't provide training and/or guidance.
>
> Now, there are some handlers that choose to in between sessions run a short search and reward their dog with a toy. The reason that they would do that is because during the certification process, as I indicated earlier, the location of the find is unknown to the handler.
>
> When the handler comes in and runs his dog and his dog locates and indicates the source, and the handler then tells me, I'm calling that location, he's not told right or wrong. There are no rewards given, they're not allowed to be given, in the search area during a certification, and no one is told whether they were right or wrong.
>
> There are a total of 14 finds in a row. Some dogs would perform just fine 14 times in a row and never get their paycheck. Some dogs really would prefer to have a paycheck somewhere in there. As I explain to guys when they're at camp, you're only going to work for so long without a paycheck. Sooner or later, you're probably going to move on.
>
> It depends on the dog and it depends on the handler. It is their own individual choice if they choose to do that or how many times they choose to do that. Some guys will run ... a reward find right after each one of the scenarios. Some will go all 14 finds and 11 searches and never do one of those.

(Doc. 71, 356:15-357:22). Duis does not conduct or watch this type of training and does not discuss it with the handlers. He hesitated to call the activity "training," as the sole purpose was to give the dog a paycheck in the middle of his examination. (Doc. 71, 360:11-22).

As to the structure and order of the recertification examinations, Duis testified that he almost always does the luggage search first. Other than that, the order of the exercises varies, depending on the weather or what else is going on. If there is another handler or instructor present who is not participating in that certification, Duis may have him set up the

-22-

finds.  For example, if Trooper Kosiba (who is an instructor) is present and Duis is examining with a group of outside agencies, Duis might ask Kosiba to set up the dark room search.  Duis would give Kosiba a blank grade sheet, Kosiba will know the drug to use and the approximate amount, and Kosiba will set it up in locations he feels would be legitimate searches.  When Duis shows up at that particular search location,  Kosiba tells Duis where the drugs are hidden and then leaves.  Duis sets up the finds himself if no handler or instructor is available to help.

All of the dogs going through the certification process complete the exercise before proceeding to the next exercise.  The exercises are not necessarily performed in the order in which they appear on the grade sheet, and the dog handlers are not given their results after each exercise.   At the beginning of the certification, the handler completes the "biographical" information on the grade sheet, signs it as the handler, and then gives the otherwise blank grade sheet to Duis.  Duis maintains the grade sheets until the entire certification process is completed and the grades calculated.  Not until that time do the handlers find out anything that is reflected on the grade sheet, e.g., the amounts, types and placement of the drugs and whether the team passed or failed.

Regarding Steven Nicely's allegations of repetitive testing, Duis explained that the issue of repetitive testing is irrelevant in the ICPSD certification process.   Nicely's "Repetitive Testing Table" (Exhibit 102) apparently indicates that during four certifications conducted between October 22, 2006 and October 9, 2007, the "luggage" exercise utilized eight grams of marijuana and 15 grams of cocaine.  Duis testified,

> the fact that those two particular drugs in similar amounts are hidden in the luggage back-to-back or three in a row or four in a row is irrelevant is because the handler has no idea what drug is being hidden in the particular scenario.
>
> The particular pieces of luggage are not the same.  In fact, each time we do a certification, we have six pieces of luggage, two of which would contain the two controlled substances, four of them would be blank. Immediately following that scenario, the two that contained the drugs for that particular

-23-

certification are disposed of and thrown away. So they are six completely new pieces of luggage each time we would do one. So the – the amount and the type of drug in a particular area is – is irrelevant.

(Doc. 71, 362:19-363:14). The same is true as to all the other search areas; the type of drug may remain the same, but the hiding place changes each time. Nothing is consistent except for the types of drugs that are hidden, and that would not have "any sort of an effect on a dog's memorization that 12 months ago there was marijuana in this same room." (Doc. 71, 363:1-7). The dog must do more than generally sense that there are drugs in the room; they must pinpoint the exact location. Although the dog or handler may remember the storage stockroom from the previous year, and even where the drugs were hidden the previous year, the drugs will be hidden in a different place each time. "They still have to find it, they still have to locate it, the dog still has to indicate to it, they still have to be able to recognize that in order for it to count." (Doc. 71, 363:8-15).

It seemed highly unlikely to Duis that these dogs would remember that 12 months ago there was only 12 grams of marijuana in a particular hiding spot versus a large amount after doing 150 to 200 sniffs in between. The handler would not know and would not be able to communicate that to the dog. Before producing information to the defense in this case, Duis was the only one who knew that the amounts were the same. "So in order for us to believe that this Repetitive Testing Table has any relevance to anything, you have to believe that a dog 12 months ago sniffed the suitcase and remembered 12 months later after all of its training and deployments and everything else – after 200 possible sniffs remembers that, hey, that's a suitcase and I'm in Grand Island certification so I know that it's only eight grams, so I have to sniff harder because it's not going to be as easy for me." (Doc. 71, 365:4-12). He agreed on cross-examination that it was possible for a handler to intentionally cue or influence the behavior of a dog. (Doc. 76, 5:22-24).

On the issue of "controlled negative testing," Duis testified on direct examination that every scenario during the certification is controlled negative testing; the handler has no idea

-24-

where the drugs are hidden.  It is a certification exam, and the handlers can assume drugs will be present, but they still have to find the drugs in the specific locations and pinpoint the sources of the odors.

Duis disagreed with Nicely's assertion that a fringed response was a false response. A fringed response meant that the dog has located the odor and has indicated close enough for the handler to recognize a fairly concise general area as to where the drug is hidden, but slightly outside the area where the judge would want the dog to be.

Sergeant Duis denied that he passed all the dogs that went through the Nebraska State Patrol's training process.  He testified that he grades the dogs on each indication and each search and I grade the handlers on their merits.  He has failed people from the Nebraska State Patrol, the South Dakota Highway Patrol, and multiple agencies in the State of Nebraska.  He has failed his lieutenant and his own boss.  (Doc. 76, 373:3-16).

Duis stated on cross-examination that he believed Mr. Nicely's background was in the military, a working dog environment, rather than the police service dog environment. In Duis' experience, the military working dog is basically on his own, and the handler has very little to do with the relationship or the partnership; the military handler is issued a dog which has already been trained by someone else.  Law enforcement officers tend to teach the handler and the police service dog to work together.  Duis teaches the handlers how to train their dogs, so they know the characteristics of their individual dogs and know "how to read the dog."  (Doc. 76, 6:4-25).  For example, using the Nebraska State Patrol's system, the handlers recognize the dog's alert.  They are able to determine whether the dog alerted prior to an indication, preventing what Mr. Nicely referred to as a false positive.  When the dog performs a physical behavior that could be confused with an indication, but no odor was there, Duis would refer to it as a false indication.  He acknowledged that the State Patrol relies heavily on its dog handlers and disagreed with Steven Nicely that a dog should always be allowed to free search.  "[I]n a military working environment that may work.  As a police

service dog, that's not going to work. You can't go down the shoulder of the interstate and let a dog search wherever it wants to search."  (Doc. 76, 8:15-18).

Duis testified on cross-examination that he personally believes that a dog's "profound alert, which is defined as an alert that would be recognized by a layperson, but does not come to a final indication behavior," provides probable cause to search.  However, Duis trains the handlers to check with their prosecutors and the case law from their own jurisdictions about the level of alert or indication required to establish probable cause. (Doc. 76, 10:3-15).

## II.  LEGAL ANALYSIS

### A.  Validity of Initial Traffic Stop

A traffic stop is a seizure within the meaning of the Fourth Amendment; thus, the stop must be reasonable to pass constitutional muster.  *United States v. Wright*, 512 F.3d 466, 471 (8th Cir. 2008) (citing *Delaware v. Prouse*, 440 U.S. 648, 653 (1979), and *Whren v. United States,* 517 U.S. 806, 810 (1996)).  The decision to stop an automobile is reasonable if the police have probable cause to believe that a traffic violation has occurred, and "[a]ny traffic violation, however minor, provides probable cause for a traffic stop."  *Id.* (quoting *United States v. Bloomfield,* 40 F.3d 910, 915 (8th Cir. 1994) (en banc), *cert. denied*, 514 U.S. 1113 (1995)).  "An otherwise constitutional traffic stop is not invalidated by the fact that it was 'mere pretext for a narcotics search.'"  *Id.* (quoting *United States v. Williams,* 429 F.3d 767, 771 (8th Cir. 2005)).  Failure to signal a turn is a violation of Nebraska law.  Neb. Rev. Stat. § 60-6,161.

Trooper Estwick testified that the defendants' red Pontiac exited at the 366 interchange and the driver failed to signal a northbound turn onto the highway from the exit ramp.  The court finds Estwick's testimony to be credible on this point and finds that Trooper Estwick had probable cause to stop the defendants' vehicle for a traffic violation.

## B.  Conduct and Duration of the Traffic Stop

The legal standards for conducting a traffic stop were recently summarized by the Eighth Circuit in *United States v. Suitt*, — F.3d — , 2009 WL 1794695 at *3, Case No. 08-2688 (8th Cir., June 25, 2009):

> "The Supreme Court has analogized roadside questioning during a traffic stop to a *Terry* stop, which allows an officer with reasonable suspicion to detain an individual in order to ask '[a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions.'" *United States v. Rodriguez-Arreola*, 270 F.3d 611, 617 (8th Cir. 2001) (quoting *Berkemer v. McCarty*, 468 U.S. 420, 439 (1984).  "A constitutionally permissible traffic stop can become unlawful, however, 'if it is prolonged beyond the time reasonably required to complete' its purpose." [*United States v. Peralez*, 526 F.3d 1115, 1119 (8th Cir. 2008)] (quoting [*Illinois v. Caballes*, 543 U.S. 405, 407 (2005)]).  "During a traffic stop, an officer may detain the occupants of the vehicle while the officer completes a number of routine but somewhat time-consuming tasks related to the traffic violation." *Id.* (quotation omitted).  "A reasonable investigation includes asking for the driver's license, the vehicle's registration, as well as inquiring about the occupants' destination, route, and purpose." *United States v. Sanchez*, 417 F.3d 971, 975 (8th Cir. 2005) (quotation omitted).  "Whether a particular detention is reasonable in length is a fact-intensive question, and there is no per se time limit on all traffic stops." [*United States v. Olivera-Mendez*, 484 F.3d 505, 510 (8th Cir. 2007)].  "When there are complications in carrying out the traffic-related purposes of the stop, for example, police may reasonably detain a driver for a longer duration than when a stop is strictly routine." *Id.*  "'Reasonableness ... is measured in objective terms by examining the totality of the circumstances.'" *United States v. $404,905.00 in U.S. Currency*, 182 F.3d 643, 646 (8th Cir. 1999) (quoting *Ohio v. Robinette*, 519 U.S. 33, 39 (1996)).

(Parallel citations omitted).

When asked for his driver's license, registration and insurance, Prokupek said he did not have his license with him.  Prokupek had no identification on his person, and Estwick had to collect Prokupek's biographical information and relay it to the dispatcher. The State Patrol dispatcher was able to verify that Prokupek had a driver's license.  Meanwhile,

-27-

Trooper Estwick observed Prokupek to be fidgety and agitated. Prokupek kept gritting his teeth and could not keep his hands or feet still. Estwick also described Prokupek's pupils as "kind of weird acting and real glossy," and testified that Prokupek exhibited the telltale signs of someone who has been using drugs.

Estwick issued Prokupek a citation and violation card. Based on Prokupek's demeanor and appearance (i.e., that Prokupek appeared to be using drugs), Estwick asked Sergeant Connelly to deploy the dog. Connelly and the dog had arrived at the scene before Estwick finished issuing the citation and warning card, and the dog's deployment took approximately one minute.

An officer who develops a reasonable, articulable suspicion of criminal activity may expand the scope of an inquiry beyond the original reason for the stop and detain a vehicle and its occupants for further investigation. *See, e.g., United States v. Poulack, 236 F.3d 932, 935-36 (8th Cir.), cert. denied, 534 U.S. 864 (2001)*). Whether an officer had reasonable suspicion to expand the scope of a stop is determined by examining the totality of the circumstances, in light of the officer's experience. *Id.*

Considering the totality of the circumstances, the court concludes that this particular detention was reasonable in length.

### C. Whether There Was Probable Cause to Search the Pontiac

The defendants both object to the warrantless search of the Pontiac vehicle, particularly since defendant McGlothlen refused Estwick's request for permission to search. In these circumstances, the officers were required to have probable cause to search the Pontiac without a warrant.

Probable cause exists where there is a "fair probability that contraband or evidence of a crime will be found in a particular place." [*Illinois v. Gates, 462 U.S. 213, 238 (1983).*] Determining whether probable cause exists at the time of the search is a "commonsense, practical question" to be judged from the

-28-

"totality-of-the-circumstances. *Id.* at 230. "Probable cause ... does not require evidence sufficient to support a conviction, nor even evidence demonstrating that it is more likely than not that the suspect committed a crime." *United States v. Mounts*, 248 F.3d 712, 715 (7th Cir. 2001) (quoting *United States v. Sawyer*, 224 F.3d 675, 678-79 (7th Cir. 2000)); *see also United States v. Carpenter*, 462 F.3d 981, 986 (8th Cir. 2006) (pointing out that reasonable suspicion has a lower threshold than probable cause and a considerably lower threshold than preponderance of the evidence); *Gates*, 462 U.S. at 244 n.13.

*United States v. Donnelly*, 475 F.3d 946, 954-55 (8th Cir.), *cert. denied*, 127 S. Ct. 2954 (2007) (parallel citations omitted). It remains the law in this jurisdiction that a positive alert by a reliable drug detection dog constitutes proof of probable cause.

Assuming that the dog is reliable, a dog sniff resulting in an alert on a container, car, or other item, standing alone, gives an officer probable cause to believe that there are drugs present. *United States v. Sundby*, 186 F.3d 873, 875-76 (8th Cir. 1999). In finding sufficient the affidavit at issue in *Sundby*, we declared that "[in order to establish the dog's reliability,] the affidavit need only state the dog has been trained and certified to detect drugs.... An affidavit need not give a detailed account of the dog's track record or education." *Id.* at 876 (citations omitted). Such statements only establish the affidavit's facial validity, however. *Id.* (holding that the defendant would have been entitled to a *Franks* hearing had he shown that officers withheld negative information casting into doubt the dog's reliability).

*Id.* at 955.

There is more than one way to train a dog. In this instance, the government's witnesses testified credibly, and at great length, as to their training and experience, the training and experience of the dog in question, and the Nebraska State Patrol's standards for training dogs and handlers and for certifying police service dogs. It is apparent that the defense expert, Steven Nicely, does not approve of the State Patrol's methods and standards; however, while Mr. Nicely is experienced in training dogs, the majority of his experience appears to have been training dogs for use in military settings or for sale in the private sector. Although Nicely was critical of the State Patrol's practice of "internal certification,"

-29-

he certified the dogs he personally trained at Global Training Academy as a condition of his employment at Global.

Nicely clearly believes that the systems used by the military and by his former employer, Global, are superior to most, if not all, other methods of training service dogs. Nicely's testimony, however, does not tend to establish that the Nebraska State Patrol's procedures[6] are faulty or inadequate, considering the purposes for which the dogs will actually be used in the field. Apparently, Mr. Nicely has limited his exposure to the training methods and certification standards advocated by the International Congress of Police Service Dogs to what he could find posted on the internet. He has never personally observed a training or certification session sponsored by the International Congress or the Nebraska State Patrol. He has had no meaningful professional contact with any trainers certified by the International Congress, except for testifying in court that he does not approve of their methods and standards.

In this case, Trooper Estwick's suspicions were aroused by the defendant's exiting the Interstate at the ruse checkpoint; however, using that particular exit was not particularly inconsistent with McGlothlen's statement that she and Prokupek were traveling from Lincoln to Shelby.[7]

The factors justifying the search of the defendants' vehicle are Trooper Estwick's testimony (which the court finds to be credible) that Prokupek appeared to have been taking drugs, together with the drug detector dog Rocky's alerts and ultimate indication to the odor of an illegal substance at the driver's driver's door seam.

---

[6]This court is persuaded that Sergeant Duis has complied with the standards set by the International Congress and the Nebraska State Patrol and accepts Duis' explanation that he had the discretion, as a judge of the International Congress, to use amounts in excess of 5 grams of a controlled substance during certification sessions.

[7]The virtues and drawbacks of the numerous routes by which one could travel from Lincoln to Shelby and/or the Columbus area were discussed extensively during the cross-examination of Trooper Estwick.

The probable cause standard does not require evidence sufficient to support a conviction, and does not even require evidence demonstrating that it is more likely than not that the suspect committed a crime.  Considering the totality of the circumstances, the court is persuaded that the dog's indication was sufficiently reliable to establish probable cause, i.e., a fair probability that contraband or evidence of a crime would be found in the defendants' vehicle.  The defendants have not succeeded in showing otherwise.

### III.  RECOMMENDATION

For all these reasons,

**IT IS RECOMMENDED** that  the defendants' motions to suppress evidence (Doc. 49 & Doc. 52) be denied.

Pursuant to NECrimR 57.3, a party may object to this Report and Recommendation by filing a "Statement of Objection to Magistrate Judge's Recommendation" within ten (10) business days after being served with the recommendation.

**DATED June 30, 2009.**

BY THE COURT:

s/ F.A. Gossett
**United States Magistrate Judge**

-31-